IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SANDRA C. BETZ, | ) | Case No. 3:21-CV-2408 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Sandra C. Betz, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  Betz challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in evaluating the medical opinion of Dr. Christopher Smallwood and failed to adequately explain his residual functional capacity ("RFC") finding that Betz was limited to superficial interactions.  Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Betz's applications for DIB and SSI be affirmed.

## I.      Procedural History

Betz applied for DIB on June 20, 2019.  (Tr. 300).  On October 10, 2019, she also applied for SSI.  (Tr. 314).  Betz said that she became disabled on October 25, 2015, due to: (i) hypothyroidism, (ii) fibromyalgia, (iii) general anxiety, (iv) social anxiety, (v) post-traumatic

stress disorder ("PTSD"), and (vi) depression.  (Tr. 331, 339).  The SSA denied Betz's

application initially and upon reconsideration.  (Tr. 201-210, 212-225).

ALJ Jeffery Raeber heard Betz's case on January 6, 2021 and denied her claim in a

February 2, 2021 decision.  (Tr. 15-27, 32-69).  In doing so, the ALJ determined at Step Four of

the sequential evaluation process that Betz had the RFC to perform light work, except that:

> [Betz] can never climb ladders, ropes or scaffolds.  She can occasionally climb
> ramps or stairs.  She can frequently balance and occasionally stoop, kneel, crouch
> and never crawl.  She can have occasional exposure to extreme cold.  She should
> avoid the use of moving machinery, commercial driving and unprotected heights.
> She can perform simple, routine and repetitive tasks that can be performed at the
> SVP one or two level.  The work environment must be free of fast-paced
> production requirements and involve only routine work places changes.  She is
> limited to occasional public contact.  She is limited to superficial contact with
> others, defined as no tasks involving arbitration, negotiation, confrontation,
> directing the work of others, persuading others or being responsible for the safety
> or welfare of others.

(Tr. 20).  Based on vocational expert testimony that a hypothetical individual with Betz's age,

experience, and RFC could work in such available positions as merchandise marker; "cleaner,

housekeeping;" and office helper, the ALJ determined Betz was not disabled.  (Tr. 26-27).  On

October 27, 2021, the Appeals Council denied further review, rendering the ALJ's decision the

final decision of the Commissioner.  (Tr. 1-3).  And, on December 27, 2021, Betz filed a

complaint to obtain judicial review.[1]  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Betz was born on October 24, 1977 and was 49 years old on the alleged onset date.

(Tr. 339).  Betz completed an associate's degree in 2013, and she had prior work as a grill cook,

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

factory worker, sales associate, and shift supervisor at a pizza restaurant and a cleaning business. (Tr. 332-333).

### B.  Relevant Medical Evidence

On October 15, 2015, Betz saw Sirisha Donepudi, M.D., regarding her hyperthyroidism. (Tr. 475).  Betz reported that she had been on and off of antithyroid medications, including some that caused her anxiety and palpitations.  *Id.*  She noted that she had a history of chronic anxiety, which "usually" got worse with antithyroid medication.  *Id.*  She also indicated she had tremors, palpitations, heat intolerance, increased sweating, and weight loss.  (Tr. 475-76).  A review of Betz's symptoms indicated she also had fatigue and was nervous/anxious.  (Tr. 477-478).  On examination, Dr. Donepudi noted that Betz was, generally, normal but had tremors when she outstretched her arms.  (Tr. 478).  Her impression was that Betz had hyperthyroidism, generalized anxiety disorder ("GAD"), and tachycardia.  *Id.*  Dr. Donepudi assessed that Betz had severe hyperthyroidism due to Graves' Disease and her uncontrolled hyperthyroidism probably exacerbated her anxiety, tremors, and palpitations.  *Id.*

On December 17, 2015, Betz saw Dr. Donepudi.  (Tr. 483).  She reported continued anxiety, tremors, and palpitations and starting medication, but admitted to missing it at least twice a week.  *Id.*  A review of her symptoms and physical examination were normal, except Betz had tremors when her arms were outstretched.  (Tr. 484).  Dr. Donepudi's impression did not change, but she intended to alter Betz's medication based on her lab work.  (Tr. 485).

On March 7, 2016, Betz saw Dr. Donepudi.  (Tr. 488).  She reported that she was not missing her medication and, although they persisted, her anxiety and tremors were better.  *Id.*  She also had palpitations, had lost 7 pounds, and was planning on moving due to a stressful living situation.  *Id.*  A review of her symptoms was normal, as was her physical examination.

3

(Tr. 490).  Dr. Donepudi's impression remained the same, and she indicated that Betz was euthyroid and she would change Betz's medication based on her lab results.  (Tr. 490-491).

On May 6, 2016, Betz saw Dr. Donepudi, reporting that she had been compliant with her medication, she still experienced palpitations, and, although they still persisted, her anxiety and tremors were better.  (Tr. 494).  A review of her symptoms and physical examination results were normal.  (Tr. 496).  Dr. Donepudi's impression only included hyperthyroidism, noting Betz was euthyroid and her thyroid medication would be adjusted based on her test results.  *Id.*

On July 6, 2016, Betz saw Dr. Donepudi.  (Tr. 498).  She reported continued compliance with her medication, noting her anxiety and tremors had improved but the palpitations continued. *Id.*  The palpitations were noted in reviewing her symptoms, but otherwise the review and her physical examination were normal.  (Tr. 500).  Dr. Donepudi's impression and assessment were unchanged.  (Tr. 500-501).

On September 12, 2016, Betz saw Dr. Donepudi.  (Tr. 502).  Betz reported being compliant with her medication and that her anxiety, tremors, and palpitations had improved.  *Id.* A review of her symptoms and physical examination results were normal.  (Tr. 504). Dr. Donepudi's impression was that Betz had hyperthyroidism, tachycardia, and GAD. (Tr. 505).  Her assessment did not, generally, change but she referred Betz for radioactive iodine ablation ("RIA") therapy.  *Id.*  Betz underwent a thyroid ablation and was noted to have tolerated the procedure "very well."  (Tr. 718).

On January 25, 2017, Betz saw Dr. Donepudi.  (Tr. 507).  She reported that, since her RIA therapy, her palpitations and tremors had resolved and her weight was stable, but she continued to have anxiety, insomnia, and fatigue.  *Id.*  A review of her symptoms and physical examination results were normal.  (Tr. 509).  Dr. Donepudi's impression was that Betz had

4

hyperthyroidism; she assessed that Betz was euthyroid and noted that, on reviewing her thyroid function tests, Betz would start thyroid hormone therapy.  (Tr. 510).

On February 13, 2017, Betz saw Christopher Smallwood, M.D., about her anxiety. (Tr. 526).  She reported that her anxiety medication was not helping, she was not interested in counseling, and her anxiety caused her to have poor sleep and acute anxiety episodes with mild provocation.  *Id.*  A review of her symptoms noted she was agitated, nervous, and anxious, but her physical examination results were normal.  (Tr. 528).  Dr. Smallwood assessed that she had GAD and osteoarthritis, for which he prescribed or continued Betz's medication.  (Tr. 529).

On March 13, 2017, Betz saw Dr. Smallwood, reporting that her anxiety and panic medications were working.  (Tr. 531).  A review of Betz's symptoms indicated she was agitated, nervous, and anxious, and her physical examination results were normal.  (Tr. 533-534). Dr. Smallwood's assessment remained unchanged, and he continued her medications.  (Tr. 534).

On April 25, 2017, Betz saw Dr. Donepudi.  (Tr. 513).  She did not report any tremors or palpitations, but noted that she had chronic anxiety and fatigue.  *Id.*  A review of her symptoms and her physical examination results were normal.  (Tr. 515).  Dr. Donepudi's impression was that Betz had postablative hypothyroidism.  (Tr. 516).  Her assessment was that Betz's was euthyroid and her medications would be adjusted based on her test results.  *Id.*

On December 7, 2017, Betz saw Dr. Smallwood, reporting that she had experienced back pain that radiated down her leg for the past week.  (Tr. 536).  Aside from the pain, a review of Betz's symptoms was normal, and, on physical examination, it was noted that she had some swelling and muscle spasms in her lower back and mild tenderness in her paraspinal muscles. (Tr. 538).  Dr. Smallwood's assessment was that she had acute midline lower back pain without sciatica.  *Id.*  He ordered x-rays, which did not reveal anything abnormal.  (Tr. 539, 541-542).

On January 29, 2018, Betz saw Dr. Donepudi.  (Tr. 519).  Betz reported missing her medication at least once a month and noted that she could not drive, which made coming for appointments difficult.  *Id.*  She also reported fatigue and chronic anxiety but not tremors or palpitations.  *Id.*  A review of Betz's symptoms and her physical examination results were normal.  (Tr. 521).  Dr. Donepudi's impression and assessment remained the same.  (Tr. 522).

On April 10, 2018, Betz saw Dr. Smallwood.  (Tr. 544).  She reported feeling "myalgias-diffuse pain" that was worse along her shoulders.  *Id.*  She also reported experiencing chronic fatigue, poor sleep, and fogginess, noting that she struggled to recall easy information.  (Tr. 545).  A review of her symptoms indicated that Betz had chills, fatigue, arthralgias, myalgias, agitation, and was nervous/anxious.  (Tr. 546).  On physical examination, Dr. Smallwood noted that she had tender points along her paraspinal area and upper shoulders, but Betz was otherwise normal.  *Id.*  He assessed that she had diffuse pain, likely fibromyalgia, and GAD.  (Tr. 547).

On June 12, 2018, Betz saw Dr. Smallwood.  (Tr. 552).  Betz reported that her pain had improved with better sleep and more exercise, although she continued to have frequent aching back pain.  (Tr. 553).  She also inquired about emotional support animals and noted that she had not started an increased dose of her anxiety medication.  *Id.*  A review of symptoms indicated that Betz had arthralgias, myalgias, agitation, and was nervous/anxious.  (Tr. 554).  On examination, Dr. Smallwood observed that Betz had multiple tender points along her paraspinal area and upper shoulders.  (Tr. 555).  He assessed that Betz had fibromyalgia and GAD, and prescribed her new medication for both conditions.  *Id.*

On June 26, 2018, Betz saw Dr. Smallwood, reporting that her pain improved with activity.  (Tr. 557).  A review of her symptoms was normal, as were her physical examination results.  (Tr. 559-560).  Dr. Smallwood's assessment remained unchanged.  (Tr. 560).

On June 30, 2018, Betz saw Dr. Donepudi.  (Tr. 680).  She reported that her fibromyalgia medication was helping, her energy had slightly improved, and she still had chronic anxiety but no tremors or palpitations.  (Tr. 681).  A review of her symptoms and her physical examination results were normal.  (Tr. 682-683).  Dr. Donepudi's impression was that Betz had postablative hypothyroidism and myalgia.  (Tr. 683).  Her assessments remained unchanged.  *Id.*

On July 27, 2018, Betz saw Dr. Smallwood, reporting that her new fibromyalgia medication was helping but she had not started her anxiety medication yet.  (Tr. 573).  A review of her symptoms was normal, as were her physical examination results.  (Tr. 575). Dr. Smallwood's assessment was unchanged; he increased her anxiety medication due to its severity and referred her to a social worker for her financial difficulties.  *Id.*

On September 26, 2018, Betz saw Dr. Smallwood, reporting that her fibromyalgia and anxiety medications were helping.  (Tr. 577).  She also reported seeing a counselor and noted that she had worsening neck and upper back pain.  *Id.*  A review of her symptoms was normal, but on physical examination she was noted to have mild tenderness in her neck with slight kyphosis present.  (Tr. 579).  Dr. Smallwood assessed that Betz had GAD, postablative hypothyroidism, neck pain, and fibromyalgia.  (Tr. 579-580).  He increased her fibromyalgia medication and ordered x-rays for her neck pain.  (Tr. 580).

On January 30, 2019, Betz saw Dr. Donepudi, reporting that she did not have tremors or palpitations, but her chronic anxiety continued.  (Tr. 593).  She indicated she had been feeling better since starting the fibromyalgia medication.  *Id.*  A review of her symptoms and her physical examination results were normal.  (Tr. 595).  Dr. Donepudi's impression was that she had postablative hypothyroidism, and she assessed that Betz was euthyroid and indicated she would adjust Betz's thyroid medication based on her test results.  *Id.*

On April 8, 2019, Betz saw Dr. Smallwood, reporting that her medications seemed to be helping.  (Tr. 581).  She reported that she was very depressed, noting her father had died unexpectedly and she could no longer see her counselor because of her father's illness and transportation issues.  *Id.*  She also noted some anhedonia, depression, and grief.  *Id.*  A review of her symptoms and physical examination results were normal.  (Tr. 583).  Dr. Smallwood's assessment was that Betz had GAD and grief, and he indicated he would increase her anxiety medication and refer her to a counselor if necessary.  (Tr. 584).

On May 7, 2019, Betz saw Dr. Smallwood, reporting that she felt groggy, her mood was not better, and she felt like she was still "in a funk."  (Tr. 585).  A review of her symptoms indicated she had a dysphoric mood and was nervous/anxious.  (Tr. 587).  On physical examination, Dr. Smallwood observed that she was generally normal but exhibited a depressed mood.  (Tr. 587-588).  He assessed that Betz had grief, GAD, and fibromyalgia and noted that she was waiting for a consultation with a counselor.  (Tr. 588).

On October 2, 2019, Betz saw Dr. Donepudi, reporting that she did not have any tremors or palpitations, but she had chronic anxiety, was stressed out, and had started depression medication.  (Tr. 603).  The review of her symptoms and physical examination results were normal.  (Tr. 605).  Dr. Donepudi's impression and assessment were unchanged.  (Tr. 605-606).

On October 14, 2019, Betz saw Dr. Smallwood, complaining of continued fatigue and indicating she was not able to work as much as she would like.  (Tr. 163).  A review of her symptoms and physical examination results were normal.  (Tr. 165-166).  Dr. Smallwood assessed that Betz had fibromyalgia and severe anxiety.  (Tr. 166).

On November 25, 2019, Betz saw Madhu Mehta, M.D.  (Tr. 635).  A review of her symptoms indicated she had fatigue, dry mouth, jaw pain, headaches, weakness, numbness, easy

bruisability, anxiety, depression, and problems with social activities.  (Tr. 635-636).  On

examination, Betz was, generally, normal but had slight pain in her shoulder and "multiple

tender points of FMS."  (Tr. 640).  Dr. Mehta's impression was that Betz had fibromyalgia,

hypothyroidism, anxiety, depression, and long-term NSAID use.  (Tr. 642-643).

On February 11, 2020, Betz saw Dr. Smallwood, reporting that her fibromyalgia

medication helped but her anxiety medication did not.  (Tr. 174).  Betz also "continue[d] to

demand" a letter supporting her need for an emotional support animal.  *Id.*  A review of her

symptoms indicated she had arthralgias and myalgias, and that she was nervous/anxious.

(Tr. 176).  Her physical examination results were normal.  (Tr. 177).  Dr. Smallwood assessed

that she had fibromyalgia, severe anxiety, and "anxiety and depression."  *Id.*

On March 11, 2020, Betz saw Dr. Smallwood, stating that she fell and had pain in her

right arm and hand.  (Tr. 183).  A review of her symptoms indicated she had arthralgias, but her

physical examination was normal, aside from pain when moving her right hand.  (Tr. 185-186).

Dr. Smallwood found that Betz sprained a joint in her right middle finger.  (Tr. 186).

On April 2, 2020, Betz saw Dr. Donepudi.  (Tr. 710).  She reported continued chronic

anxiety but no tremors or palpitations.  *Id.*  She also reported being stressed and on depression

medication.  *Id.*  A review of her symptoms was normal.  (Tr. 712-713).  Dr. Donepudi's

impression and assessment remained unchanged.  (Tr. 713).

### C.    Relevant Opinion Evidence

#### 1.    Limitation Questionnaire – Sirisha Donepudi, M.D.

Around October 2019, Dr. Donepudi completed a questionnaire on Betz's functional

limitations.[2]  (*See* Tr. 611-612).  She reported that she diagnosed Betz with postablative

---

[2] The actual questionnaire submitted is unsigned and undated.  However, the Commissioner identifies it
as being completed by Dr. Donepudi following Betz's October 2019 appointment.  *See* ECF Doc. 8 at 3.

hypothyroidism, noting that in 2013 Betz had inadequate control over it and additionally had chronic anxiety. (Tr. 611). She indicated that various tests had been done to discern the thyroid's level of functioning and Betz would need continued appointments for lab work and adjusting her medication. *Id.* Dr. Donepudi also noted that Betz was on hormone therapy and was euthyroid on clinical examination on October 2, 2019. (Tr. 612). She indicated that there had not been any issued with Betz's compliance and there were no limitations from her hyperthyroidism. *Id.*

### 2.      Psychiatric Assessment – Don McIntire, Ph.D.

On February 12, 2020, Betz underwent a disability assessment with Don McIntire, Ph.D. (Tr. 613-622). During their interview, Dr. McIntire observed that Betz's appearance and behavior appeared normal, as did her conversation and thinking, except for one instance when she forgot an instruction in the middle of responding to a task. (Tr. 618). She presented a normal range of emotions, and her mood was congruent with the topic of conversation. *Id.* As to her anxiety, Dr. McIntire noted that Betz appeared calm, made and maintained eye contact, and remained calm when she worked on the mental status exam tasks. *Id.* She did, however, shake her leg at times, which may have reflected anxiety or restlessness. *Id.* Betz did not exhibit any hallucinations, delusions, signs of flashbacks, or intrusive memories. (Tr. 618-619). Dr. McIntire also noted she was alert and focused, had organized thinking and tight associations, and did not exhibit confusion or disorientation. (Tr. 619).

Dr. McIntire further observed that Betz had no difficulties with her long-term memory and was fully oriented. (Tr. 619). He indicated that Betz adequately performed a variety of metal status assessment tasks, except she was unable to subtract by 7s from 100. *Id.* He stated that Betz appeared to be functioning within an average range of intelligence and had a good fund

10

of knowledge.  *Id.*  As to her insight and judgment, Dr. McIntire noted that Betz had a fair awareness of the nature and extent of her symptoms and difficulties, but she overestimated her abilities in other areas and exhibited poor judgment in an arbitrary situation.  *Id.*  Her judgment in daily life, however, Dr. McIntire noted was fairly good.  (Tr. 619-620).

As to Betz's daily living activities, Dr. McIntire noted that Betz reported having some anxiety when she went grocery shopping on her own and difficulty concentrating when watching television.  (Tr. 620).  Betz reported that she could read with slight difficulties in comprehension, and could make change, but could not divide.  *Id.*  She also admitted to having some difficulty in keeping track of her own appointments and that she was unable to drive a car.  *Id.*

Dr. McIntire's assessment was that Betz had mild difficulties with anxiety on the job and being distracted by noise.  *Id.*  He assessed her with moderate major depressive disorder, single episode; and GAD.  (Tr. 621).  Specifically, as to her social functioning, he found that Betz had a fair ability to get along with co-workers because she had been in arguments and was fired from a job.  (Tr. 622).  He also noted that her ability to manage everyday work stress was somewhat limited as she occasionally responded to minor problems with catastrophic thinking and panic, stating "[s]he may escape anxiety by leaving her work station or work site, but she does not avoid the stress as she generally was able to get to work."  *Id.*

### 3.    Letter Assessment – Christopher Smallwood, M.D.

On November 20, 2020, Dr. Smallwood provided a letter indicating his assessment of Betz's condition.  (Tr. 732).  He noted that he had treated Betz primarily for anxiety and fibromyalgia and, at that time, he believed both conditions would limit her ability to work full time because neither was fully controlled.  *Id.*  Betz's anxiety would cause her to be absent multiple times a month and her fibromyalgia would make any physical labor difficult to perform

11

more than 2 to 3 hours at a time. *Id.* Additionally, because of both her conditions, she would be limited in her ability to concentration for more than 1 to 2 hours at a time. *Id.*

### 4. Medical Source Statement – Christopher Smallwood, M.D.

On December 30, 2020, Dr. Smallwood completed a medical source statement on Betz's ability to perform work-related activities. (Tr. 735-740). As to her social interactions, he assessed that Betz was moderately impaired in her ability to accept instruction from or respond appropriately to criticism from supervisors or superiors, but was otherwise only mildly limited. (Tr. 735). He found that Betz had a marked limitation in her ability to maintain attention and concentration for more than brief periods of time, and had moderate limitations in her ability to carry through with instructions and complete tasks independently and in her ability to perform at production levels expected by most employers. (Tr. 736). Otherwise, as to sustained concentration and persistence, he found that she was only mildly limited. *Id.*

As to her adaptation, Dr. Smallwood found that Betz, generally, had only moderate limitations, except she was mildly limited in her ability to maintain her personal appearance and hygiene and had no limitation as to her ability to be aware of normal hazards and take necessary precautions. *Id.* He also noted that she had a marked limitation in her ability to tolerate customary work pressures. (Tr. 737). He noted that Betz was likely to have unscheduled absences from work 2 or more times a month because of her conditions and she would likely deteriorate if placed under stress, particularly the stress of a full-time position. *Id.*

### 5. State Agency Consultants

#### a. Physical Consultants

On July 24, 2019, William Bolz, M.D., reviewed Betz's physical health records to determine her RFC. (Tr. 207-209). Exertionally, Dr. Bolz found that Betz was limited to

occasionally lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds, standing or walking 6 hours in an 8-hour day, and was unlimited in her pushing or pulling aside from the extent of her lifting and carrying.  (Tr. 207).  As to postural limitations, Dr. Bolz found that she could frequently climb ramps/stairs; occasionally climb ladders, ropes, or scaffolds; frequently stoop; and frequently crawl.  (Tr. 208).  Dr. Bolz also found that Betz should avoid concentrated exposure to hazards but was otherwise unlimited.  (Tr. 208-209).  On January 26, 2020, Leon Hughes, M.D., reconsidered Betz's medical records.  (Tr. 222-224).  Dr. Hughes agreed with Dr. Bolz's assessment of Betz's limitations.  *Id.*

### b.  Mental Health Consultants

On July 26, 2019, Kristen Haskins, Psy.D., reviewed the medical evidence to determine whether Betz had any mental functioning limitations, but found that there was insufficient evidence to make any determinations.  (Tr. 205-206).  On February 21, 2020, Carl Tishler, Ph.D., reconsidered the medical evidence of mental functioning limitations and reached the same conclusion as Dr. Haskins.  (Tr. 219-220).

### D.  Relevant Testimonial Evidence

### 1.  Sandra Betz

Betz testified at the hearing.  (Tr. 38-55).  Betz explained that she last worked in 2014 as a shift supervisor for a pizza restaurant; and prior to that, she had worked as a sales associate at a retail store, a shift supervisor for a cleaning business, as a line lead at a factory, and as a grill cook at a cafeteria.  (Tr. 38-42).  She normally cooked and did household chores during the day, but took breaks after a half hour to an hour; she did not drive because she did not have a car. (Tr. 43, 49).  She explained that her conditions affected her ability to work because they caused her a great amount of pain.  (Tr. 44).  She could not lift more than 25 pounds, and she would

13

have occasional hand tremors when she was stressed.  *Id.*  She had experienced the tremors since 2013 because of her thyroid, and they would last a couple of days and cause her to drop things and have trouble writing.  (Tr. 44-45).  She also had muscle weakness in her arms, trouble standing or walking after several hours, and sitting for long periods of time.  (Tr. 45-46).

Betz testified that her thyroid treatment resulted in her hyperthyroidism and caused her to have fatigue, muscle weakness, hand tremors, insomnia, depression, and anxiety.  (Tr. 47).  She explained that she had anxiety in situations such as in testifying, going to the store, or being around people.  *Id.*  She also noted pain from her fibromyalgia.  (Tr. 49).  During a given two weeks, she stated that her physical condition would fluctuate but mentally, it was always in the back of her head that she could not handle what she used to be able to.  (Tr. 50).  She had good days and bad days in terms of her concentration and would need to write things down in multiple places to ensure she remembered things.  (Tr. 51).  She would occasionally have trouble following the plot of a book after not reading it for a day or two.  (Tr. 54).  She quit her last job because she was "stressed out" and she had "gotten into it" with the owner, but her performance at the time was acceptable, as far as she knew.  (Tr. 52).

Betz stated that she had struggled with depression for the last 20 years and she would have good days when she was not hurting really bad, but then she would slip and "just not care" for a week or two.  *Id.*  During these latter periods, she would not get up or get dressed every day.  (Tr. 52-53).  She also experienced symptoms of anxiety, such as pacing, talking fast or not at all, and trouble thinking straight.  (Tr. 53).  She did not think she could work a full-time position because of her physical symptoms and the connected anxiety and depression.  *Id.*  She would have "recovery days" where she would play games on her phone and sleep, one to three

times a week.  (Tr. 54).  Betz explained that she would take time to lay down every day, which sometimes turned into naps that could last from three to five hours.  (Tr. 55).

### 2.  Vocational Expert

Gail Klier testified at the hearing as a vocational expert ("VE").  (Tr. 56-68).  The ALJ asked the VE to opine whether a hypothetical individual with Betz's age, education, work experience, and RFC (as ultimately determined by the ALJ) could perform work in the national economy.  (*See* Tr. 57-58).  The VE testified that such an individual could not perform Betz's past work but could perform other jobs such as a merchandize marker, "cleaner housekeeping," and office helper.  (Tr. 58-59).  The ALJ posed an additional hypothetical, asking: "if an individual could have no public contact, and occasionally do tasks with interaction with coworkers, would that affect any of those light or sedentary jobs?"  (Tr. 61).  The VE replied that it would change her answers.  *Id.*  Subsequently, Betz's counsel asked the following:

> If a hypothetical individual is limited in their ability to interact with others to a – to a superficial level – and by superficial, I mean, if they're walking by somebody, they can say hello, but in terms of stopping to talk or interact or participate in any more than a brief and cursory hello, goodbye – does that allow competitive employment?

(Tr. 63-64).  The VE indicated that no competitive work could be performed under that definition of superficial contact.  (Tr. 64).

### III.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quotation marks omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision, when the Commissioner's reasoning does not build an accurate and logical bridge between the evidence and the result.  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

**B.      Step Four: Dr. Smallwood's Medical Opinion**

Betz contends that the ALJ erred in finding Dr. Smallwood's opinions unsupported,

because he provided a letter, sufficient explanations, and other treatment records in support of his

given opinions.  ECF Doc. 7 at 12-15.  She argues that the ALJ failed to explain how this

evidence was considered in relation to his supportability findings.  ECF Doc. 7 at 15.  The

Commissioner disagrees.  ECF Doc. 8 at 11-16.

At Step Four of SSA's sequential evaluation process, the ALJ must determine a

claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R.

§ 404.1520(e).  In doing so, the ALJ is required to "articulate how [he] considered the medical

opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum,

the ALJ must explain how he considered the supportability and consistency of a source's medical

opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2)[3].

According to the regulation, the more consistent a medical opinion is with the evidence from

other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is

the consistency standard.  And the regulation specifies that the more relevant the objective

medical evidence and supporting explanations presented by a medical source are to support his

or her medical opinion, the more persuasive the medical opinion will be.  This is the

supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Because Betz challenges how the ALJ supported and articulated his supportability

finding, rather than whether the ALJ properly applied the basic supportability and consistency

criteria of the regulations, the court will focus on the ALJ's findings and his discussion of those

---

[3] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

findings, rather than whether he complied with the regulations themselves.  Although the ALJ's analysis could have benefited from further elaboration and refined discussion, the absence of these qualities does not ultimately hamper the court's review; and, thus, any errors in the ALJ's RFC determination were harmless and were not so egregious as to render meaningful review impossible.  *See* 42 U.S.C. § 405(g); *Rodgers*, 486 F.3d at 241; *Bowen*, 478 F.3d at 746.

The ALJ highlighted three areas in which Dr. Smallwood's opinion was not supported: Betz's (i) likely absenteeism, (ii) ability to persist in mental and physical work, and (iii) marked limitation in handling work pressure.  (Tr. 24).  The ALJ also noted that Betz's mental health appeared to be largely tied to her thyroid issues and treatment.  *Id.*  If we were to look solely at this paragraph of the ALJ's decision, Betz would have a point.  The ALJ provides "reasons" of a sort for finding the opinion unpersuasive, yet those reasons fail to provide any meaningful explanation that would aid a reader in understanding why, based on the evidence, the ALJ found these areas unsupported.  *See Reynolds*, 424 F. App'x at 416; *Fleischer*, 774 F. Supp.2d at 877.

The court's review, however, is not limited to the ALJ's single paragraph discussion of Dr. Smallwood's opinion.  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").  And, in evaluating the entire decision, the ALJ's reasoning for finding those three particular opinion areas to be unsupported becomes clear.  The ALJ provided several references to Dr. Smallwood's treatment notes (from Exhibits 2F and 3F).  The ALJ's summary of the notes highlighted the mild or moderate conditions recorded in Dr. Smallwood's treatment records.  For example, it was noted that Betz had "mild osteoarthritis," reported improvement with her anxiety and panic disorder, reported "feeling better with improved sleep and more exercise," and had normal mental status examination results.  (*See* Tr. 18, 21-22).

18

In contrast to the mild findings in his treatment notes, however, Dr. Smallwood's November 20, 2020 letter opined that Betz would likely miss 2 or more days a month because of her conditions; that Betz had a "marked" (meaning that she was unable to function 26% to 50% of the work day or workweek) limitation in tolerating customary work pressure; and Betz had a "marked" limitation in her ability to maintain attention and concentration.  (*See* Tr. 736-737). Dr. Smallwood's treatment notes did not explicitly contradict the findings of his opinion because his notes were not expressed in terms of vocational limitations.  But it cannot be ignored that the ALJ had reason to find Dr. Smallwood's "marked" limitation findings to be unpersuasive; and he also had a basis for finding Dr. Smallwood's opinions on Betz's absenteeism, ability to handle work pressure, and ability to persist to be unsupported.  Thus, the ALJ's decision as a whole, when read with common sense, does build a logical bridge between his decision to discount Dr. Smallwood's November 20, 2020 opinion and the lack of support for those opinions in Dr. Smallwood's treatment notes.  *Fleischer*, 774 F. Supp.2d at 877.  Betz impliedly invites the court to reweigh the evidence and second guess the ALJ's analysis, something we are prohibited from doing.  *See Jones*, 336 F.3d at 476.

Moreover, substantial evidence supports the ALJ's determination that Dr. Smallwood's opinions were unpersuasive.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241. Such evidence includes: (i) the lack of any treatment notes indicating Betz missed appointments or activities due to her conditions; (ii) treatment notes indicating her conditions were, generally, normal or controlled with medication, (Tr. 478, 484, 488, 490, 494, 500, 504, 509, 515, 521, 528, 533, 546, 559-560, 575, 579, 583, 587-588, 595, 605, 640, 682-683); (iii) routine treatment notes indicating she was euthyroid, (Tr. 491, 496, 500, 505, 510, 516, 522, 595, 606, 683, 713); (iv) treatment notes indicating her mental conditions were likely linked to her hyperthyroidism,

19

(Tr. 478, 488, 494, 498, 502, 507); and (v) Dr. Donepudi's finding that she had no limitations

based on her thyroid condition, (Tr. 611-612).  *See Biestek*, 139 S. Ct. at 1154.  Accordingly, the

ALJ applied the proper legal standards, or harmlessly erred in doing so, and reached a decision

supported by substantial evidence in finding Dr. Smallwood's opinions to be unpersuasive.

### C.      Step Four: Residual Functional Capacity

Betz contends that the ALJ failed to adequately explain either his RFC determination that

Betz was limited to "superficial contact" or his definition of the term "superficial."  ECF Doc. 7

at 9-11.  She argues that, despite the ALJ having supplied a definition of "superficial," he failed

to provide any reasoning or explanation for using that definition or for rejecting Betz's counsel's

alternative definition (which Betz argues was more consistent with the plain meaning of the word

superficial).  ECF Doc. 7 at 9-11.  The Commissioner disagrees.  ECF Doc. 8 at 16-23.

Additionally, the Commissioner argues that Betz would not be entitled to the immediate payment

of benefits.  ECF Doc. 8 at 23-24.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's

RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e),

416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her

impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R.

§ 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the

[ALJ] must consider limitations and restrictions imposed by all of an individual's impairments,

even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a

claimant's medical history, medical signs, laboratory findings, and statements about how the

symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996

SSR LEXIS 5.

The term "superficial interaction" is not defined under the Dictionary of Occupational Titles ("DOT") or Selected Characteristics of Occupations ("SCO"). *See Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-2370, 2022 U.S. Dist. LEXIS 43108, at *49 (N.D. Ohio Jan. 13, 2022). And there have been contrary findings as to whether the "plain meaning" of the term requires further definition. *See Beulah v. Comm'r of Soc. Sec.*, No. 1:20-CV-2271, 2022 U.S. Dist. LEXIS 92055, at *94 (N.D. Ohio Mar. 25, 2022) (holding that the term "superficial" does not have a defined meaning for purposes of vocational testimony); *but contrast Dawn M. v. Comm'r of Soc. Sec.*, No. 3:20-CV-0258, 2022 U.S. Dist. LEXIS 102055, at *18 (S.D. Ohio June 7, 2022) (holding that the term "superficial" "is a well-defined limitation in the Social Security context."). In cases in which the definition of "superficial" interaction has been in dispute, however, it has been tied to the consideration of VE testimony or a medical opinion. *See e.g., Stoodt*, 2022 U.S. Dist. LEXIS 43108 at *47-54 (remanding the ALJ's decision because the ALJ failed to build a logical bridge between the evidence and the ALJ's finding that the claimant was limited to "superficial" interactions when such findings were contrary to the state agency consultants' opinions); *Beulah*, 2022 U.S. Dist. LEXIS 92055, at *86-98 (remanding the ALJ's decision because the ALJ failed to adequately explain her failure to include a "superficial" interaction limitation in the RFC after putting one to the VE).

In *Mirlin T. v. Kijakazi*, No. 20-CV-960, 2021 U.S. Dist. LEXIS 260414, at *24-25 (D.C. Dist. Ct. Aug. 24, 2021), the District Court for the District of Columbia addressed a similar situation, however, in reviewing a challenge to the ALJ's RFC limitation to employment "without fast pace or strict production requirements." There, despite finding that the ALJ provided adequate explanation of the evidence relied on, the court found that the ALJ had failed to sufficiently explain what he meant by "fast pace" or "strict production quotas," and, thus,

remanded the case.  *Id.* at *24-25, 27.  Without such definitions, the court noted, the ambiguity

of the terms resulted in the court being unable to determine whether the VE would have

identified the same – or any – position the hypothetical person could perform.  *Id.* at *28

(internal quotation marks omitted).

The ALJ applied the proper legal standards and reached a decision supported by

substantial evidence in determining that Betz was limited to superficial social interactions.  42

U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  At its core, Betz's argument rests on the

contention that the ALJ failed to adequately explain how he chose his definition of the term

superficial contact, making the definition arbitrary.  The ALJ, however, defined the scope of

"superficial" interactions and used that definition both in posing hypothetical questions to the VE

and in articulating his RFC findings.  (Tr. 20, 57-58).  Further, none of the opinion evidence

provided a conflicting definition of superficial contact.  Thus, unlike other cases that have

addressed an ALJ's use of the term "superficial" interactions, this case does not hinge on

whether the ALJ's definition was consistent with the VE's or other opinions' articulations.

Consequently, it is helpful to take a step back and consider the ALJ's responsibilities.

The regulations provide that it is the ALJ's exclusive duty to assess the claimant's RFC.  *See* 20

C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The

responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician.").  In

doing so, he may pick and choose from the medical opinions and limitations supported by the

record evidence, provided there is an explanation.  *See* 20 C.F.R. § 404.1545(a); *Ferrell v.

Comm'r of Soc. Sec.*, No. 1:19-CV-2289, 2020 U.S. Dist. LEXIS 206834, at *28 (N.D. Ohio

Nov. 5, 2020).  In considering these limitations and questioning the VE about them, the ALJ

must put the limitation in vocational terms.  *See Ferrell*, 2020 U.S. Dist. LEXIS 206834, at *28.

From this process the ALJ defined "superficial contact" as: "no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety or welfare of others."  (Tr. 20).

Looking at the decision as a whole and with common sense allows for meaningful review of the ALJ's evaluation of Betz's RFC.  *See Reynolds*, 424 F. App'x at 416.  Although the ALJ must connect the RFC limitations to the evidence and build a logical bridge between the two, this does not require that the ALJ provide explicit reasoning for why he defined superficial the way he did.  Rather, the ALJ needed to explain why he determined that Betz was limited to superficial contact *as he defined it*, and it is sufficient that the record not be clearly contrary to that definition.  *See Fleischer*, 774 F. Supp. 2d at 877.  And here, the ALJ's discussion of the record evidence related to Betz's mental health conditions built such a bridge.

The ALJ explained, in discussing the medical listings, that Betz had only moderate limitations in her social interactions.  (Tr. 19).  He later explained that he found Dr. Smallwood's opined limitations to be unpersuasive, noting that Betz's mental health conditions appeared to be linked to her thyroid condition and improved with treatment.  (Tr. 24).  He also explained that he found Dr. McIntire's opinion persuasive, which indicated Betz had a fair ability to socially interact.  *Id.*  Lastly, the ALJ's summary of the medical evidence included many observations of about Betz's mental state, none of which was suggested functional limitations that were contrary to the ALJ's definition.  (*See* Tr. 21-25).  The ALJ also acknowledged Betz's testimony (that she had previously left her workstation to calm down but was generally fine with constructive criticism from supervisors) and Dr. McIntire's opinion that Betz had a fair ability to work with coworkers.  (Tr. 22, 24).

From this broader context, I find it was reasonable for the ALJ to have defined "superficial" in the manner he did.  And it was reasonable for the ALJ to find that Betz should be limited regarding certain types of contact based on the ALJ's reference to persuasive evidence of limitations in the record evidence.  Betz contends that her counsel's definition was more consistent with the plain meaning of "superficial."  But we need not resort to the plain meanings, because the ALJ specifically defined what he meant by superficial.  Further, unlike in *Mirlin*, the ALJ's choice to define "superficial" by what it does not include, does not raise the same ambiguity concerns that would arise from an ALJ's use of the undefined term "fast paced."  It is readily understood what functional capacities are involved with arbitration, negotiation, or confrontation.  The ALJ had an evidentiary basis for finding Betz limited to superficial contact as he defined it.  There is no lack of a logical bridge problem in this instance.

Moreover, substantial evidence supports the ALJ's finding.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Such evidence includes, (i) treatment notes generally indicating that Betz was normal, (Tr. 165-166, 176, 185-186, 478, 484, 490, 496, 500, 504, 509, 515, 521, 528, 533-534, 538, 546, 554, 559-560, 575, 579, 583, 587-588, 595, 605, 682-683); (ii) Betz's reports indicating that her anxiety improved with her medication and thyroid treatment, (Tr. 475, 488, 494, 498, 502, 531); (iii) treatment notes indicating Betz was euthyroid, (Tr. 490-491, 496, 510, 516, 595, 612); and (iv) Dr. McIntire's opinion that Betz had a fair ability to get along with her coworkers but was somewhat limited in her ability to manage everyday stress, (Tr. 622).  *See Biestek*, 139 S. Ct. at 1154.

More specifics are always helpful.  However, they are not always strictly necessary to meet the requirements of the regulations.  Although the ALJ did not explicitly provide a reason for why he chose to define "superficial" as he did, the evidence both makes such a definition

24

reasonable and does not directly contradict any portion of it.  Nor has Betz identified any contradictory evidence.  As such, for us to nitpick the ALJ's definition of "superficial" would risk involving us with invading the zone of choice within which the Commissioner operates.  *See Jones*, 336 F.3d at 476.  Accordingly, because the ALJ applied the proper legal standards and reached a decision supported by substantial evidence, the ALJ's decision must be affirmed.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Because the ALJ's decision must be affirmed, no immediate award of benefits need be considered.  *See Wiser v. Comm'r of Soc. Sec.*, 627 F. App'x 523, 526-27 (6th Cir. 2015).

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Betz's applications for DIB and SSI be affirmed.

Dated: November 8, 2022

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be

25

specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).